**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

*IN RE HAGUE CHILD ABDUCTION APPLICATION*

| | | |
|---|---|---|
| MAXIM DROZDOV, | ) | |
| *Petitioner*, | ) | Case No. 4:10-CV-1002 |
| | ) | |
| and | ) | |
| | ) | |
| ANNA DROZDOVA, | ) | |
| a/k/a ANNA DONALDSON | ) | |
| *Respondent*. | ) | |

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HIS
FIRST MOTION FOR SUMMARY JUDGMENT**

COMES NOW PETITIONER, by and through counsel, and for his *Memorandum*, states:

## INTRODUCTION

Rule 56(a) of the Federal Rules of Civil Procedure authorizes a party filing for relief to move for summary judgment.[1]  The movant is entitled to summary judgment if the pleadings, any discovery or affidavits, and disclosure materials show that there is no genuine issue as to any material fact, thereby entitling the movant to judgment as a matter of law.[2]

## UNDISPUTED MATERIAL FACTS

The parties were married in Valletta, Malta, in 1998.[3]  Child A was born of the marriage in the City of London, England.[4]  Petitioner is the natural father of Child A.[5]  This litigation concerns Child A, a minor child, aged 10 years.[6]  Child A is a dual citizen of Russia and the

---

[1] Rule 56(a), Fed. R. Civ. P.
[2] Rule 56(c)(2), Fed. R. Civ. P.
[3] Answer, ¶3.5.
[4] Id., ¶3.16.
[5] Id., ¶4.1.
[6] Id., ¶1.4.1.

Netherlands, who was living in the United Kingdom on or about February 7, 2010.[7] Child A attended Caldicott School in London for the 2009-2010 school year.[8] On or about February 7, 2010, Respondent removed Child A from the United Kingdom to the United States.[9] Respondent never requested Petitioner's permission to relocate Child A to the United States.[10] Respondent informed Petitioner that she had removed Child A to St. Louis by correspondence from her English solicitor to his English solicitor.[11] Child A is currently physically located in St. Louis, Missouri.[12]

As a part of their divorce in 2007, the parties promised "to cease all disputes so that their divorce does not have a negative influence on their son's education, to turn all parental attention towards their son so that he does no suffer from moral or psychological trauma or any other form of prejudice."[13]

## ADDITIONAL MATERIAL FACTS

After their marriage in 1998, the parties returned to the United Kingdom to live.[14] Child A has lived his entire life in the United Kingdom prior to his removal to the United States.[15] Child A has never lived in Russia.[16] Child A was enrolled in school in the United Kingdom for all school years prior to his removal to the United States.[17] The parties had planned to enroll Child A in a fine English preparatory school for the next school year before removal, and in fact

---

[7] Id., ¶3.7.
[8] *See*, letter from Headmaster Simon Doggart, attached as **Exhibit 4**.
[9] Answer, ¶4.12.
[10] Id., ¶4.13.
[11] Id., ¶4.11.
[12] Id., ¶2.4.
[13] Id., ¶3.13.
[14] Affidavit of Max Drozdov, ¶2, attached as **Exhibit 1**.
[15] Id., ¶3.
[16] Id., ¶4.
[17] Id., ¶¶5 and 11.

had corresponded with multiple schools regarding enrollment requirements.[18]  Child A is

enrolled in English preparatory for the 2010-2011 school year.[19]  Child A had a settled network

of friends and schoolmates in London.[20]  Physicians and dentists in the United Kingdom have

always treated Child A.[21]  Petitioner and Respondent never discussed the possibility of Child A

moving to a country outside of the United Kingdom.[22]  Petitioner did not consent to the removal

of Child A from the United Kingdom.[23]

Petitioner was exercising his parental rights at the time of the removal by, *inter alia*,

sending Child A gifts, calling Child A and/or Respondent on the telephone and attempting to see

him whenever he visited London, contacting and attempting to contact Child A via SMS

messaging, taking him on vacations and paying child support (alimony).[24]  Prior to removing

Child A to the United States, Respondent prevented Petitioner from knowing Child A's

whereabouts and having meaningful contact with him.[25]  Petitioner enjoyed parental

responsibility rights by virtue of being Child A's father and being married to Respondent at the

time of Child A's birth in England.[26]  Under English law, Petitioner had the shared right to

decide the country of Child A's residence.[27]

Petitioner and Respondent were divorced on May 11, 2007, by a Chief Judge of the

District Court of Justice in the City of Moscow, Russian Federation.[28]  A Decree and Amicable

---

[18] Id., ¶12.
[19] Id., ¶13.
[20] Id., ¶15.
[21] Id., ¶14.
[22] Id., ¶17.
[23] Id., ¶16.
[24] Id., ¶6.
[25] Id., ¶6 and 17.
[26] Affidavit of Simon Beccle, ¶5, attached as **Exhibit 2**.
[27] Id., ¶7.
[28] Affidavit of Max Drozdov, ¶7.

Agreement governs the parties' divorce.[29]  Under the Decree and Amicable Agreement, Petitioner retained full parental responsibility rights under English Law.[30]  As part of the Amicable Agreement, Respondent promised to "assist and not interfere with the Petitioner's rights to communicate and visit [Child A] and the execution of his responsibilities towards the child's education."[31]

By removing Child A from England without the consent of Petitioner, Respondent has *prima facially* committed the criminal offense of abduction under English law.[32]  Child A has not lost his habitual residence in England as a consequence of his removal to the United States.[33]

## THE LAW

In order to prevail on his petition to return Child A under the Hague Convention, Petitioner must only prove, by preponderance of the evidence, that Child A has been "wrongfully removed or retained" from his "habitual residence."[34]  ***Importantly, the residence of Child A's parents prior to removal is completely irrelevant to the habitual residence analysis as it relates to Child A.***[35]  The removal or retention is wrongful if it violated Petitioner's custody rights that he was exercising at the time of removal.[36]  Petitioner need not prove anything else, and ***the burden shifts*** to Respondent to demonstrate that she is entitled to one of a limited number of defenses under the Convention.[37]  Under the ICARA, Respondent must prove she is entitled to

---

[29] Id., ¶8.
[30] Id., ¶9.
[31] Id., ¶10.
[32] Affidavit of Simon Beccle, ¶6.
[33] Id., ¶9.
[34] 42 U.S.C. §11603(e)(1)(A).
[35] 19 I.L.M. 1501, Art. 3.
[36] Id.
[37] Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995).

an exception by clear and convincing evidence.[38]  Since Petitioner has established a *prima facie*

case, this Court should grant summary judgment, as it is obvious Respondent has failed to

produce any facts that establish an exception.  Finally, no consideration may be given as to Child

A's best interests, because the Hague Convention only addresses the jurisdiction of a court to

decide whether a child has been wrongfully removed or retained; and does not provide any

foundation for a court to address custody issues.[39]  Thus, a district court may not consider

evidence pertaining to the merits of custody such as whom is the better parent or what are the

best interests of the child.[40]

## ENGLAND IS CHILD A'S HABITUAL RESIDENCE

Child A has dual citizenship, including as a citizen of the Netherlands, which is a

member of the European Union.  As such, Child A has the right to live in England without

further requirements.

Citizenship and habitual residence are not to be confused.  Again, it is imperative to be

mindful that Petitioner and Respondent's place of residence prior to removal is ***completely***

***irrelevant*** to the habitual residence analysis regarding Child A.[41]  Although the term "habitual

residence" is not defined in the Hague Convention, it is not intended to be considered a technical

term at all, but rather is to be read broadly in the context of the Convention's purpose of

---

[38] 42 U.S.C. § 11603(e)(2)(A).

[39] "Article 19 of the Convention and ICARA do not allow a court applying the Convention to adjudicate the merits of any underlying custody claims.  Rather, in an action for the return of a child to the habitual residence, a petition must prove only that the child was removed or retained `wrongfully' as the term is defined in Article 3 of the Convention."  Rydder v. Rydder, 49 F.3d. 369, 372 (8th Cir. 1995).

[40] Nunez-Escudero v. Tice-Menley, 58 F.3d. 374, 376 (8th Cir. 1995); "In an ICARA suit, a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim."  Diorinou v. Mezitis, 237 F.3d 133, 140 (2d Cir. 2000). Van Driessche v. Ohio-Esezeoboh, 466 F.Supp.2d 828, 841 (S.D. Tex. 2006).

[41] 19. I.L.M. 1501, Art. 3.

discouraging unilateral removal of a child from that place *where the child lived at the time of removal or retention*.[42]  A person can have only one habitual residence, which is often defined as one's customary residence immediately prior to the removal.[43]  Because the determination of habitual residence is primarily a fact-based determination and not one which is encumbered by legal technicalities, a court must look at those facts, the shared intentions of the parties, the history of the child's location and the settled nature of the family prior to the facts giving rise to the request for return.[44]  In this way, habitual residence is not the same as citizenship.  It has been said that the cornerstone of the Convention is the mandated return of the child to his or her circumstances immediately prior to the abduction.[45]

In any event, contrary to Respondent's position, Russia cannot be Child A's habitual residence, because, as noted, Child A has never lived there.[46]  The United Kingdom is Child A's only possible country of habitual residence, because, *inter alia*, (1) he has lived his entire life in the United Kingdom;[47] (2) he was enrolled in and attended school in London for all school years prior to removal;[48] (3) he had a settled network of friends and schoolmates in London;[49] (4) physicians and dentists in the United Kingdom have always treated him;[50] (5) he has never lived in another nation, except for time after he was abducted to the Unites States, and; (6) he is presently enrolled in Caldicott preparatory school.[51]

---

[42] Kijowska v. Haines, 463 F.3d 583, 588-89 (7th Cir. 2006).
[43] Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993), hereinafter Friedrich I.
[44] Mozes v. Mozes, 239 F.3d 1067, 1073 (9th Cir. 2001); Feder v. Evans-Feder, 63 F.3d 217, 224 (3rd Cir. 1995).
[45] Feder, 221.
[46] Affidavit of Max Drozdov, ¶4.
[47] Affidavit of Max Drozdov, ¶3.
[48] Id., ¶11.
[49] Id., ¶15.
[50] Id., ¶14.
[51] Id., ¶4.

**PETITIONER HAD RIGHTS CONTEMPLATED AND PROTECTED BY
THE HAGUE CONVENTION (AND THUS ICARA) AT THE TIME OF REMOVAL**

As this Court is aware, removal is considered wrongful if it is in breach of custody rights enjoyed in the country of a child's habitual residence, and at the time of removal, those rights were being exercised.[52] Again, Child A's nationality, to the extent it does not coincide with his habitual residence, is irrelevant to the habitual residence analysis. As noted, Habitual residence is often defined as one's customary residence immediately prior to the removal.[53] For the reasons set forth in the previous section, the only evidence in this case is that Child A's habitual residence, and in fact the only country where he has ever lived, is the United Kingdom.

As such, the primary intention of the Convention is to preserve whatever *status quo* custody arrangement existed for Child A at the time of the alleged wrongful removal or retention.[54] As demonstrated by the sworn testimony of Simon Beccle, attached as **Exhibit 2**, Petitioner enjoyed parental responsibility with respect to Child A under The Children Act 1989, which is the primary legislation relating to the welfare of children in England and Wales.[55] Among the rights afforded to Petitioner was the right to determine Child A's place of residence.[56] Petitioner obtained these rights under English law by virtue of being Child A's father and being married to Respondent at the time of Child A's birth in England.[57] To this day, and despite the wrongful removal of Child A, Petitioner retains full parental responsibility rights as to Child A under English law.[58]

Russian law and the alleged divorce documents are irrelevant under the Convention and

---

[52] *Hague Convention*, Article 3.
[53] Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993), hereinafter Friedrich I.
[54] *Hague Convention*, Preamble.
[55] Affidavit of Simon Beccle, ¶¶3 and 5.
[56] Id., ¶¶4 and 7.
[57] Id., ¶5.
[58] Id., ¶11.

ICARA, because the law of the nation of Child A's habitual residence determines the existence of custodial rights and obligations of parent and child, not the laws of the country of Child A's citizenship.[59] Since Child A's habitual residence prior to removal was England, its laws determine the parents' custodial rights and obligations to Child A.[60] Again, under English law, Petitioner enjoys rights and has obligations that are completely independent of what might be set forth by a Russian divorce decree or agreement.[61]

Even assuming *arguendo* that Russian law and Russian divorce documents control, Respondent is still not vested with the right to remove Child A from the United Kingdom without Petitioner's consent.[62] Under the relevant documents, Petitioner retained full parental responsibility rights, and Respondent promised to "assist and not interfere with [Petitioner's] rights to communicate and visit [Child A] and the execution of [Petitioner's] responsibilities toward [Child A's education].[63] No language appears in the Russian decree granting Respondent the exclusive and unilateral right to relocate Child A without Respondent's consent. Even under the Russian decree, Respondent's removal of Child A was wrongful and his return to the United Kingdom is mandated.

## RESPONDENT'S DEFENSES FAIL AS A MATTER OF LAW

In the interests of judicial economy, Petitioner refers this Court to his *First Motion to Strike Respondent's Affirmative Defenses [Doc. #66]*. For purposes of a summary judgment motion that is fully compliant with Rule 56, however, Petitioner renews his arguments that Respondent is unable to find refuge under any of her claimed "affirmative defenses."

---

[59] *Hague Convention*, Article 3; Friedrich v. Friedrich, 78 F.3d 1060, 1066 (6th Cir. 1996), hereinafter, Friedrich II.
[60] Friedrich II, 1066.
[61] Affidavit of Simon Beccle, ¶¶4, 7 and 11.
[62] Affidavit of Igor Avrameko, ¶¶5, 6, 7, 8 and 9, attached as **Exhibit 3**.
[63] Affidavit of Max Drozdov, ¶¶9, 10.

## 1. Prohibited defenses

In paragraph B of her *Answer*, Respondent pleaded the unauthorized defenses of laches, estoppel and unclean hands. These defenses are outside the scope of what is permitted by ICARA.[64] Respondent's pleading contains unauthorized defenses inviting irrelevant and prejudicial evidence in this case, which will create confusion and error thereby.[65] Therefore, these unauthorized defenses fail as a matter of law and cannot defeat Petitioner's *Motion for Summary Judgment*.

## 2. Authorized defenses

### A. Fundamental freedoms

In paragraph E of her "affirmative defenses," Respondent alleges that returning Child A to the United Kingdom "would offend fundamental principles relating to the protection of human rights and fundamental freedoms of Drozdova [Respondent], a lawful resident of the United States and the State of Missouri."[66] It is true that Article 20 of the Convention contemplates a "fundamental freedoms" defense to removal. The full text of Article 20, however, states:

> The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights or fundamental freedoms."[67]

Respondent's reliance on the "fundamental freedoms" defense fails as a matter of law for several reasons. First, given ICARA and the Convention's singular focus on the return of wrongfully removed children,[68] Respondent cannot reasonably claim refuge for herself personally under a provision that instead so obviously concerns itself with the freedoms and rights of Child A. In

---

[64] 42 U.S.C. §11603(e)(2).
[65] Id.
[66] Answer, ¶E.
[67] *Hague Convention*, Article 20.
[68] 42 U.S.C §11601(b)(1); *Hague Convention*, Preamble; Article 1.

other words, Respondent's pleading concerns Respondent's personal, fundamental freedoms, when the defense actually relates to the fundamental freedoms of Child A. Second, by seeking refuge under the "fundamental freedoms" defense, Respondent urges a truly absurd position: that Respondent, who has wrongfully removed Child A from his habitual residence, may avoid his return out of concern for her own rights. This would reward wrongful removal! Third, Respondent's "fundamental freedoms" defense must be stricken because English law is capable of protecting both Child A and Respondent's rights and freedoms. The American legal system, of course, draws heavily from the English system, and Respondent has not – and cannot – reasonably argue that English courts are incapable of handling any custody dispute once Child A is returned.[69] Respondent's "fundamental freedoms" defense is fatally flawed as a matter of law and must be stricken.

### B. Grave risk of harm

Under Article 13(b), a child should not be returned if a respondent proves by clear and convincing evidence that there is a grave risk of harm if they are returned to the country of habitual residence.[70] "Courts have interpreted 'grave risk of harm' to mean either (1) the return of the child puts the child in imminent danger prior to resolution of custody, such as returning the child to a zone of war, famine, or disease, or (2) the case is one of serious abuse or neglect…"[71] The standard for establishing grave risk of abuse or neglect is very high.[72]

In the present case, neither party has made allegations of abuse or neglect. Additionally,

---

[69] *See,* Stone v. Powell Wolff v. Rice, 428 U.S. 465, 499 (1976), where Chief Justice Burger's concurrence described the courts of England as "models of judicial decorum and fairness" (internal citations omitted).
[70] *Hague Convention*, Article 13(b).
[71] Giampaolo v. Erneta, 390 F. Supp. 2d 1269, 1284 (N.D.Ga. 2004), citing Friedrich II, 1069.
[72] Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (evidence of verbal abuse and an incident of physical shoving of the child's mother, while regrettable, did not rise to level of conduct required for 13(b) defense).

Respondent cannot reasonably argue that England is "a zone of war, famine or disease." As a result, Respondent's grave risk of harm defense utterly fails as a matter of law.

## C.     Defenses relating to Petitioner's actions

In her Answer, Respondent claims that Petitioner either acquiesced to the removal of Child A to the United States, or failed to exercise his parental rights at the time of the removal.[73] As set forth in Petitioner's affidavit (**Exhibit 1**), and as further set forth herein, Petitioner was actively exercising or seeking to exercise his rights at the time Respondent wrongfully removed Child A to the United States.[74]

In Friedrich II, the Sixth Circuit discussed the nature of the term "exercise" under the Convention:

> The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find "exercise" whenever a parent with de jure custody rights … *seeks to keep*, any sort of regular contact with his or her child.[75]

As the Ninth Circuit has noted with respect to the "exercise" of custody rights:

> If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custodial rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custodial rights in any manner, the court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly.[76]

---

[73] Answer, ¶¶G and J.
[74] Affidavit of Max Drozdov, ¶6.
[75] Friedrich II, 1064 (emphasis added).
[76] Asvesta v. Petroutsas, 580 F.3d 1000, 1018 (9th Cir. 2009) ("a decision about the adequacy of one parent's exercise of custody rights is dangerously close to … the merits of the custody dispute.").

The Fifth Circuit has also found that even occasional visits and contributing to the child's financial support constitute "exercise" within the meaning of the Convention.[77] Therefore, even if Petitioner was a distant or absent father, that is not enough to defeat his parental rights.

Furthermore, the Convention places the burden of proving the non-exercise of custody rights on Respondent.[78] This is an impossible bar for Respondent to reach. The undisputed facts of this case are clear that Petitioner made regular support payments for the benefit of Child A; he took Child A on vacation; he called Child A and/or Respondent on the telephone and attempted to visit Child A whenever he visited London; he contacted and attempted to contact Child A via SMS messaging; and he searched for Child A after Respondent secreted him away in England and then removed him to the United States.[79]

### 3. Full faith and credit and comity

#### A. Full faith and credit

Respondent's "affirmative defenses" allege that this suit is barred by alleged Russian court orders, judgments and agreements are entitled to full faith and credit.[80] ICARA specifically contemplates giving orders or judgments issued by any State in the Union Full Faith and Credit under the U.S. Constitution, providing:

> Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment *of any other such court* ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.[81]

---

[77] Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 344 (5th Cir. 2004).
[78] *Hague Convention*, Article 13.
[79] Affidavit of Max Drozdov, ¶6.
[80] Answer, ¶C.
[81] 42 U.S.C. §11603(g) (emphasis added).

The plain language of the ICARA defines "State" as "any of the several States, the District of Columbia, and any commonwealth or possession of the United States."[82]  The Second Circuit has held that the requirement to give full faith and credit to other Hague or ICARA judgments is specifically limited to judgments rendered by a court sitting within the territory of the United States.[83]  Therefore, Russia is clearly not a "State" within the meaning of ICARA.

Even if Respondent were able to establish that Russia is a "State" for purposes of the ICARA – which she cannot – the Decree is still not entitled to full faith and credit because the above-cited portion of the ICARA specifically contemplates that full faith and credit is to be afforded for proceedings "ordering or denying the return of a child, pursuant to the Convention."[84]  Respondent does not and cannot allege that any Russian proceedings were filed under the Convention, so her "full faith and credit" defense is similarly inapplicable as a matter of law.  Again, even if the Russian decree controls, it grants Petitioner sufficient rights so as to be protected under the Convention.

B.    Comity

Respondent claims that any Russian decree must be entitled to comity, therefore barring the present action.[85]  American law is well settled that foreign courts are entitled to comity in three particular contexts.[86]  First, an American court might defer to a foreign court because of the pendency or availability of litigation in that country – in essence, invoking the principle of forum

---

[82] 42 U.S.C. §11602(8).
[83] Diorinou v. Mezitis, 237 F.3d 133, 142 (2nd Cir. 2000) ("judgments rendered in a foreign nation are not entitled to the protection of full faith and credit," quoting Restatement (Second) Conflict of Laws).
[84] 42 U.S.C. §11603(g).
[85] Answer, ¶D.
[86] Diorinou, 139.

non-conveniens.[87]  Second, an American court might accept the adjudication of a foreign court on a cause of action or particular issue.[88]  Finally, an American court might decide to enforce a foreign judgment.[89]

Comity does not apply in the present case, because *inter alia*, Respondent has failed to cite particularly to a foreign jurisdiction's ruling that is entitled to such deference, has failed to cite to a specific paragraph or section of such a ruling and has failed to explain to this Court how precisely a divorce decree would bar Petitioner from filing suit in this Court.  Respondent's "affirmative defense" of comity is therefore completely inapplicable in this context, vague, wholly unsupported and should be discarded as a matter of law.  Furthermore, the comity defense is inapplicable because there is no litigation pending in Russia and there is no issue this Court is called upon to decide that a Russian court has already decided.

## RETURN IS MANDATORY AS A MATTER OF LAW

The record clearly demonstrates that Petitioner has proven his prima facie case that Child A was wrongfully removed from his habitual residence.[90]  The record is also clear that Petitioner was actively exercising, or attempting to exercise, custody rights at the time of the wrongful removal.[91]  Furthermore, as fully set forth herein and in Petitioner's *First Motion to Strike Respondent's Affirmative Defenses [Doc. #66]*, each of Respondent's "affirmative defenses" fails as a matter of law.  Therefore, Petitioner is entitled to summary judgment on his *Petition [Doc. #1]*.

---

[87] Id., citing Finanz AG Zurinch v. Banco Economico S.A., 192 F.3d 240, 246-50 (2nd Cir. 1999); Jota v. Texaco, Inc., 157 S.W.3d 153, 159-61 (2nd Cir. 1998).
[88] Diorinou, 139 (internal citations omitted).
[89] Id., citing Hilton v. Guyot, 159 U.S. 113 (1895); Victrix Steamship Co. v. Salen Dry Cargo A.B., 825 F.2d 709 (2nd Cir. 1987).
[90] 42 U.S.C. §11603(e)(1)(A).
[91] Id.

## CONCLUSION

WHEREFORE, Petitioner prays this Court enter summary judgment in his favor, and for other such relief deemed just and proper under the circumstances.

**SPOENEMAN, WATKINS & HARVELL, LLP**

/s/  Brian L. Harvell, LC
Brian L. Harvell, LC, #90419
906 Olive Street, Suite 1010
St. Louis, MO 63101
Direct Dial – (314) 862-3013
Toll-Free, Direct Fax – (877) 865-9082
Brian@HarvellLaw.com

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the July 16, 2010, a true and accurate copy of the foregoing was filed electronically with this Court and that this Court's CM/ECF system shall therefore have automatically served an electronic copy of this pleading upon the following counsel of record:

Leigh Joy Carson, Esq.
THE CARSON LAW FIRM, LLC
7730 Carondelet Ave., Suite 300
Clayton, Missouri 63105
314-721-2422 Phone
314-721-1663 Fax
familylawinfo@thecarsonlawfirm.com

*Attorneys for Respondent*

Susan E. Block, EDMo. 500776
David M. Slaby, EDMo. 5231791
165 N. Meramec Ave., Suite 110
St. Louis(Clayton) , MO  63105-3772
Telephone: (314) 727-2266
Facsimile: (314) 727-2101
dslaby@pcblawfirm.com
sblock@pcblawfirm.com

/s/  Brian L. Harvell, LC